## Rick's Appeal.

1. A woman, seventy-five years of age, and unable to read or write, executed a deed of trust to her brother as trustee of all her property. By the terms of the trust she was to receive the income of the estate, amounting to about $300 per annum, during her life, and after her death the corpus was to be divided among certain beneficiaries. There was no power of revocation in the deed, which was prepared by counsel, and it appeared that the settlor executed it without being clearly and accurately informed of its legal effect. Some years afterwards the settlor executed a deed of revocation, and filed a bill in equity against her trustee for a re-conveyance of her estate:

   *Held*, that the settlor had been misled by those on whom she had a right to rely, that the settlement was improvident, and that, therefore (the rights of third parties not having intervened), it was competent for the settlor, by deed duly executed, to revoke the settlement and compel her trustee to re-convey her estate.

2. A purely voluntary conveyance, intended to promote the convenience and protect the interests of the grantor, and passing no present interest to others, may be revoked at will, although it does not contain an express power of revocation. In such a deed provisions for the benefit of third parties to take effect after the grantor's death are testamentary, and therefore revocable, or they may be regarded as covenants for posthumous gifts, and as such *nuda pacta*.

   Frederick's Appeal, 2 P. F. S., 338, followed.

3. In the absence of any motive for an irrevocable gift it is unreasonable that a voluntary conveyance should be without a power of revocation. This circumstance, and the failure of counsel to advise the insertion of such power, go to show that the conveyance was not made with deliberate will, and the burden of supporting the settlement will in such case be thrown upon him who claims against a settlor who is *sui juris* and capable of taking care of his own estate.

March 4, 1884. Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett, Green and Clark, JJ.

Appeal from the Court of Common Pleas of *Berks county:* Of January Term, 1883, No. 343.

This was a bill in equity by Magdalena Peiffer against John S. Rick, setting forth (1) that on March 16, 1878, Magdalena Peiffer executed a deed of assignment of all her estate to John S. Rick in trust, inter alia, to collect the rents, issues and profits, or permit the complainant to collect and enjoy the same, and upon her death to divide the personal estate among certain persons named, and to convey the real estate to certain others named.

(2) That when the said deed was executed John S. Rick and A. G. Green, Esq., the attorney who drew the deed, represented to complainant that it was revocable, and could be annulled at pleasure; that on the faith of this representation

she executed the paper, and without which she would not have signed it.

(3) That by virtue of said deed John S. Rick, the trustee, got possession of certain bonds, deeds, etc.

(4) That on June 30, 1881, the complainant executed a deed duly revoking the deed of July 6, 1881, and on July 12, 1881, gave to Rick, the trustee, actual notice of said revocation, and demanded a re-delivery of the personal property in his possession, and a re-conveyance of the house in Stouchsburg, which he refused to do.

The bill prayed an account of the rents, issues and profits; an order to pay over the balance due; for discovery of the assets of the estate; and a re-conveyance of the real estate.

After answer filed, the case was referred to Isaac Heister, Esq., as master and examiner, who reported the facts as follows:

In February, 1878, Mrs. Magdalena Peiffer, the plaintiff, was a widow, aged seventy-five years, unable to read or write, living in Stouchsburg, Berks county, possessed of an estate of four or five thousand dollars, and a life interest in a mortgage of twenty-five hundred dollars, given in trust for her by her former husband, to Augustus Burkholder. Her sister, Maria A. Phillips, aged about sixty years, lived with her. Her brother, John S. Rick, the defendant, aged about fifty-six years, lived in Port Clinton, Schuylkill county, where he has been for five years a justice of the peace. About February, 1878, while Rick was visiting Mrs. Peiffer in Stouchsburg, she expressed dissatisfaction with Burkholder, her trustee, and it was determined that Rick should be substituted for Burkholder in that trust. Rick offered to consult counsel as to the necessary steps to be taken, and accordingly, on March 9, 1878, called on A. G. Green, Esq., an attorney of Reading. [To Mr. Green, instead of asking for a change in the trusteeship of the Burkholder mortgage, Rick stated that his sister wanted to fix her property in some way that she might not be subject to annoyance on the part of persons who might desire to borrow money of her.] Mr. Green suggested a declaration of trust, which he told Rick would be permanent and could not be changed. Rick said he thought this was what Mrs. Peiffer wanted, but Mr. Green declined to draw the paper until he had seen Mrs. Peiffer personally.

Rick then went to Stouchsburg and informed Mrs. Peiffer of his consultation with Mr. Green. He testified that he asked her whether she wanted to sell or dispose of any property; told her that a deed of trust would be permanent, and that she could not change it; and that she said she did not want to sell any of the estate; that she wanted to keep her

9 OUTERBRIDGE.—34.

things together; and he then arranged to meet her in Reading on a day he would fix. Mrs. Peiffer's recollection of this interview has entirely failed, but Mrs. Phillips testifies that Rick told Mrs. Peiffer that Mr. Green would draw up a paper by which he (Rick) would supersede Burkholder, and that he had been to Reading to consult Mr. Green about it. At this time, it must be remembered, [the only trust which Mrs. Peiffer has before her mind was the mortgage in which she proposed to substitute Rick for Burkholder as the trustee; she wanted it "sure," as she defines the word "permanent,"] and anticipated no necessity for changing that again. As to disposing of her property, she may well have answered that she wanted to keep her things together, or may have assented to Rick's assuming entire control of her affairs without at all guessing the length to which he was leading her. Rick returned to Reading, fixed the following Saturday with Mr. Green for the meeting, and notified Mrs. Peiffer of the day by mail.

On the morning of the day appointed, March 16, 1878, Rick came from Port Clinton, and Mrs. Peiffer and Mrs. Phillips from Stouchsburg, and meeting at the depot in Reading, all proceeded to Mr. Green's office. Rick introduced the subject by stating that he had brought Mrs. Peiffer down for the purpose of having a paper drawn, such as he and Mr. Green had spoken about. Mr. Green then proceeded to explain to Mrs. Peiffer that the difference between a will and declaration of trust was that the latter would be a permanent act which she could not change. At the same time Rick produced Mrs. Peiffer's will, which he had written for her several months before, or a copy of it, and Mr. Green understood Mrs. Peiffer to desire to execute such a trust as he had described, with a limitation of her estate on her death, to the same persons as she had named in her will. Mrs. Peiffer, who was an illiterate woman, depending on her brother to arrange her affairs according to her understanding of his plans, while apparently assenting to Mr. Green, [said little or nothing, and it is by no means certain that she understood him to be doing anything more than carrying out the arrangement which she supposed her brother had desired of him.] Throughout the whole of her conversation with Mr. Green, as described by him, [she nowhere appears of her own accord, or in her own words, to have expressed a wish for such a deed of trust as was prepared for her, or to have given any certain signs that she ever understood that she was doing anything further than she originally intended.] Mr. Green made some memoranda, and told the parties all to call again in the afternoon when he would have the paper ready. They returned in the afternoon,

when Mr. Green read the paper over to them slowly and distinctly. [It is not likely that the formal reading over of the legal language of the instrument conveyed any further information of its contents to such a person as Mrs. Peiffer;] it does not appear at this time to have been any further explained to her. Mrs. Phillips testifies positively that Mrs. Peiffer signed the paper under the impression that it was nothing but a trust to supersede the Burkholder trusteeship. If she did understand that she was giving Rick the management of her property generally, considering her own and Mrs. Phillip's positive testimony that she was informed by Rick and by Mr. Green that she could change it at any time, as showing her own impression, it is hardly possible that she supposed she was making an irrevocable disposition of her estate. There is no other evidence that she at any time intended to do so. After the reading was concluded, Mrs. Peiffer made her mark to the paper, and a notary was called in to take her acknowledgment. She paid Mr. Green for his services, and the party left with the paper, which was recorded the same day.

Rick then took charge of Mrs. Peiffer's property, and proceeded to collect her outstanding moneys by suit and otherwise. On one occasion Mrs. Peiffer and Mrs. Phillips were present at an arbitration in a suit brought by Rick as trustee. In the fall of 1878 Mrs. Phillips said to Richard Lechner, in Mrs. Peiffer's presence, that everything was placed in Rick's hands, mentioning the word "trustee," and saying that they did not have much confidence in Burkholder and changed it to Rick. In April, 1881, with Mrs. Peiffer's approval, Rick purchased a house out of the funds of the estate, and removed there. Mrs. Peiffer at the time stated to several neighbors that now she had her brother near to attend to her business. But shortly after this Mrs. Phillips became suspicious of Rick's management of some of her affairs, and communicated her distrust to Mrs. Peiffer, who shared her dissatisfaction, employed Mr. Derr as her counsel, and on June 30, 1881, executed a revocation of the deed of trust, which she caused to be recorded, and then made demand on Rick for a redelivery of her estate, and on his refusal filed this bill.

The master having stated that the two questions of law raised in the case were: *First.* Was the deed of trust a revocable instrument? and *Second.* If not, did the grantor sign it under such circumstances that she was entitled to revoke it? answered both of these questions in the affirmative, and reported a decree in accordance with the prayers of the bill.

Exceptions filed to this report by the respondent were dismissed, and the report of the master confirmed by the court,

HAGENMAN, P. J., whereupon the respondent took this appeal, assigning for error, inter alia, the action of the court in confirming (1) Those findings of fact by the master enclosed in brackets as above.   (4) The finding of fact that $300 òr $400 might be inadequate to Mrs. Peiffer's wants, and the trust, .therefore, improvident, and that, under the circumstances of the case it was the duty of the attorney who drew the trust to have inserted in it a power of revocation, and that in the absence of such power the grantor is entitled to relief; and (5) that the court erred in confirming the master's report on the ground that the instrument was revocable under the ruling in Frederick's Appeal, 2 P. F. S., 338.

*John W. Ryon* (with whom was *H. D. Green*) for appellant.— In certain cases, such as Hall *v.* Hall, L. R., 14 Eq., 365, cited by the master, a power of revocation may be advisable and desirable, but the principle is not applicable to all cases.   It depends upon the circumstances of the particular case whether the failure to insert or advise a power of revocation is ground for relief.   Here the insertion of the power would have been impolitic and disastrous, as it was the manifest intention of the settlor to divest herself of all control over her property in order to avoid the importunities of borrowers.   Frederick's Appeal, 2 P. F. S., 238, is no longer recognized as a safe rule in cases of executed trusts, but stands on its own special facts. In the present trust the conveyance is made to the trustee, *his heirs and assigns* in trust; it provides for no compensation to the trustee for his services, nor is there any reservation or limitation in this instrument which gives the grantor any authority to supervise the administration of the trust, all which will be found to exist in Frederick's Appeal.   But the most vital difference . is that in the deed ·of Mrs. Peiffer the beneficiaries, after her death, are not mere volunteers.   One of them, and the principal one, being the trustee himself, is vested with an immediate title, although its enjoyment is postponed until after the death of Mrs. Peiffer.   It is not therefore a covenant for posthumous gifts, as was said in Frederick's Appeal, but the trustee is to stand seised to certain uses; and in the fact that it is an executed and not an executory trust, it is similar to the case of Dennison *v.* Goehring, 7 · Barr, 177, in which GIBSON, C. J., says: "I ask whether the limitations of the equitable interest are not complete and· final, or whether they require the power of a chancellor to direct a conveyance in order to settle them: " Reese *v.* Ruth, 13 S. & R., 434.; 'Greenfield's Estate, 2 Harris, 489; Ritter's Appeal, 9 P. F. S.,.9; Mack's Appeal, 18 P. F. S.,

231; Eckman *v.* Eckman, 18 P. F. S., 460; Fellow's Appeal, 12 Norris, 470.

*Cyrus G. Derr*, for the appellee.—The instrument was revocable under Frederick's Appeal, 2 P. F. S., 338, as it is precisely similar to the deed there construed, except that words of inheritance are omitted in the latter. This is of no significance, as words of limitation are not necessary to vest a fee or trust where the intent is manifest: Ivory *v.* Burns, 6 P. F. S., 301. Frederick's Appeal is distinguishable from Dennison *v.* Goehring, 7 Barr, 175, and Greenfield's Estate, 2 Harris, 501, by the fact that the manifest intention of the settlor (as in this case) was simply to promote his convenience and protect his own interests. Frederick's Appeal is recognized in Ritter's Appeal, 9 P. F. S., 9, and Fellow's Appeal, 12 Norris, 470. The appellant at least is estopped from setting up the irrevocability of the instrument, because it was represented to the appellee to be revocable when it was executed. The absence of the power of revocation, the failure of counsel to advise its insertion, and the improvident nature of the deed, are sufficient to set it aside, especially as against one who claims as a mere volunteer, without consideration: Coutts *v.* Acworth L. R., 8 Eq., 568; Naldred *v.* Gilham, 1 P. Wms., 577; Wollaston *v.* Tribe, L. R., 9 Eq., 44; Hall *v.* Hall, L. R., 8 Ch. Ap., 430; Russell's Appeal, 25 P. F. S., 269; Garnsey *v.* Mundy, 24 N. J. Eq., 243; S. C., 13 Am. Law Reg., N. S., 345, with note by Mr. G. T. Bispham, reviewing the English decisions.

Mr. Justice PAXSON delivered the opinion of the court, April 14, 1884.

The first five assignments of error are to the findings of fact by the master. It is unnecessary to discuss these assignments in detail for the reason that no clear error in the master's findings has been pointed out; on the contrary the evidence more than sustains his conclusions. Its careful examination tends strongly to show that Mrs. Peiffer signed the deed of trust in ignorance of its legal effect; that she had no intention of depriving herself of all control of her property in the future; and that the brother in whom she confided misled and deceived her. The idea of placing her entire property beyond her control never occurred to her mind, so far as the evidence shows until it was suggested to her by others. Her only object was to have Mr. Burkholder removed as trustee. Burkholder was trustee of a mortgage, the interest of which was payable to her. For some reason she did not wish him to receive the interest. The appellant spoke to her upon the subject. This is what

occurred according to his own statement: "Mrs. Peiffer wanted Burkholder put out of the trusteeship; he had been trustee in the mortgage. I told her that I did not know; she did not want him to have any of her money in hand, to collect her interest. I told her that I could not tell, that I was not versed in such matters. I told her if it was her desire I would see counsel, and would see what was best to be done in the matter. She told me to do so. I called on Mr. Green," &c.

It will thus be seen that Mrs. Peiffer authorized the appellant to consult Mr. Green only about having Mr. Burkholder removed as trustee of the mortgage. What he did is best told by Mr. Green, whom the appellant called as a witness. He said: "Sometime in March 1878, John S. Rick called in reference to making a declaration of trust of his sister Mrs. Magdalena Peiffer, who was at the time living in Stouchsburg. He was living in Port Clinton, and had just been up to see Mrs. Peiffer. He said that Mrs. Peiffer wanted to fix her property some way that she would not be subject to annoyance on the part of persons who might desire to borrow money of her. I told him that I knew of no other way of doing this except by a declaration of trust;" &c.

The appellant does not appear upon his own showing to have said a word to his counsel upon the subject as to which he was authorized to consult him. Instead of doing so he introduces an entirely different matter, and informs counsel that Mrs. Peiffer wanted "to fix her property some way that she would not be subject to annoyance on the part of persons who might desire to borrow money of her." It is not too much to say in view of this that the idea of this trust deed originated in the brain of the appellant, and that the burden of proof is upon him to show that it was the free and uncontrolled act of Mrs. Peiffer and made with a full knowledge on her part of its force and effect.

With such a beginning it is not difficult to see the end. Mrs. Peiffer was taken to Mr. Green's office and executed the deed in question. She says, in which she is corroborated by her sister, that she was told the deed could be changed, that is, "she could take it back at any time." The appellant and Mr. Green testified they told her that if she made a trust it would be irrevocable, and could not be changed like a will. If Mrs. Peiffer signed the deed under the representation that it could be revoked, then a fraud was practiced upon her; if under the advice that she could not insert a power of revocation, she was wrongly advised; she acted under a mistake, partly of law and partly of fact; she was misled by those whose duty it was to inform her, and upon whom she had a right to rely with confidence. It is true the deed was read

over to her, and if the rights of third parties had intervened she might perhaps have been bound. But no third parties are interested in this case. The deed was purely voluntary; no present interest passed to any one. It is not difficult to understand that the reading of the paper would afford her but little light. She was an ignorant old woman, and the technical phraseology of a deed could well be misunderstood by such a person.

Not only was this deed irrevocable in its terms, but it was improvident. Judging from the amount of the estate the income could not much exceed three hundred dollars. While this sum might be ample during health, sickness or other causes might render it wholly inadequate. Circumstances might arise where it would require the whole income to pay the wages of an attendant. Yet under the deed there is no power to provide for any extraordinary expenditure, however essential to her life, comfort or health.

The sixth assignment alleges that "the court erred in confirming the master's report on the ground that the instrument is revocable under the ruling in Frederick's Appeal."

The case in hand is upon all fours with Frederick's Appeal (2 P. F. S., 338), and if that case is still law, the court below committed no error. It was held that the instrument was in effect a mere power of attorney; an instrument of agency and revocable at pleasure; that the deed was made for the grantor's own personal convenience; that the trustees were to account to him for all they did under the powers vested in them, and that no beneficial interest was to vest in his children till after his death. A disposition of property to take effect after the grantor's death, is testamentary, and therefore revocable. The decision in Frederick's Appeal did not rest upon the form of the instrument merely. It was decided distinctly upon the ground that the conveyance was without consideration; that it was purely voluntary, to promote the convenience and protect the interests of the grantor; that it passed no present interest, and as to those who were to be benefited after his death, "it was a mere covenant for posthumous gifts, and as such *nudum pactum*."

It is said, however, in the case in hand, a present interest passed to the appellant. This scarcely rises to the dignity of an argument. The interest is only to take effect after the death of Mrs. Peiffer. His possession is that of a trustee merely, not that of a beneficiary under the deed. For his lawful services as trustee, and for money properly expended, he is entitled to be reimbursed out of the trust estate.

We are unable to see that Frederick's Appeal is in conflict with the earlier cases of Dennison *v.* Goehring, 7 Barr., 175;

and Greenfield's Estate, 2 Harris, 489. The first case was distinguished by the learned judge who delivered the opinion in Frederick's Appeal, and we may say in .addition that in Dennison .v. Goehring a present interest passed under the deed to some of the beneficiaries, while in Frederick's Appeal, as before stated, no such interest passed, but on the contrary the deed was only for the convenience of the grantor. Greenfield's estate was not referred to in the opinion in Frederick's Appeal, although cited by the appellees in that case. It is to be observed, however, that no attempt appears to have been made by Mrs. Greenfield in her lifetime to revoke the trust, nor did her will in terms revoke it, so far as I can gather from the report of the case. Had the deed contained an express power of revocation, her executor after her death would have no standing to enforce such clause unless Mrs. Greenfield had done so by a deed in her lifetime, or by her will to take effect after her death. Be that as it may, it is certain that Frederick's Appeal was · intended to create an exception to the general rule that an instrument which conveys an estate *in presenti* to a trustee, and is intended to take effect upon its delivery, even though the grantor is the only beneficiary during his life, cannot be considered testamentary or revocable. The later decisions carefully distinguish those cases where a present beneficial interest is given to third persons. Thus, in Ritter's Appeal, 9 P. F. S., 9, Frederick's Appeal was held not to apply for the reason that a present interest was vested in the wife. The same distinction was observed in Fellows' Appeal, 12 Norris, 470. In neither of them is there an intimation that Frederick's. Appeal is not still law.

As I have before said the circumstances of this case point clearly to the fact that this deed was not executed understandingly. To this must be added the fact that the deed was not only irrevocable, but was also improvident. There is a line of English cases which hold that in the absence of any motive for an irrevocable gift, .it is unreasonable that a voluntary conveyance should be without a power of revocation : Naldred v. Gilham, 1 P. Wms., 577 ; Huguenin v. Basely, 14 Vesey, 273 ; Coutts v. Acworth, L. R., 8 Eq., 558 ; Hall v. Hall, L. R. 8 Chan. Ap., 430. In the last case the rule was laid down as follows : "The absence of a power of revocation in a voluntary deed, not impeached by any undue influence, is of course material where it appears that the seller did not intend to make an irrevocable settlement, or where the settlement is of such a nature, or was made under such circumstances as to be unreasonable and improvident, unless guarded by a power of revocation." Our own well considered case of Russell's Appeal, 25 P. F. S., 269, sustains the same view. It

[Kaufman *v.* Cooper Iron Co.]

was there said that "the absence of the power of revocation in the deed, and failure of counsel to advise it, are circumstances with others to show that the act was not done with deliberate will."

It would be unwise in us to hold that a person may not make an irrevocable gift, nor would the authorities sustain it. There may be instances in which it is to the highest interest of a man to place his estate beyond his control irrevocably. He may do so to protect himself against his own infirmities. But the exercise of such a power should be closely guarded, particularly when exercised by ignorant people without any necessity or especial motive for denuding themselves of their property. The intent to make the gift irrevocable should be clear. As was said in Russell's Appeal: "In the absence of a certain intent to make the gift irrevocable, the omission of a power to revoke is prima facie evidence of a mistake, and casts the burthen of supporting the settlement upon him who, without a consideration or a motive to benefit him or protect the donor, claims a mere gratuity against one who is sui juris, and capable of taking care of his own estate."

If Mrs. Peiffer intended to make a settlement of her property, which is more than doubtful, she ought at least to have been advised that it was lawful to insert a clause of revocation in the deed. On the contrary she was advised that it could not be done, according to the appellant's own version of the affair. It is evident she executed the paper under a mistake of both law and fact, which is the most charitable view we can take of the case. That equity will relieve under such circumstances is settled by Wheelen's Appeal, 20 P. F. S., 410.

The decree is affirmed, and the appeal dismissed at the costs of the appellant.